J-S71002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.B | : | |
| | : | |
| Appellant | : | No. 2481 EDA 2019 |

Appeal from the Order Entered August 22, 2019
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): 0C1208305

BEFORE: BOWES, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 28, 2020**

B.B. ("Father") appeals *pro se* from the August 22, 2019 custody order that awarded him and J.W. ("Mother") shared legal custody of their son, A.W., and awarded Mother primary physical custody during the academic year. The order granted Father periods of partial physical custody during the school year and shared physical custody during the summer. We affirm.

A.W. was born in July 2010. Mother initiated the underlying custody litigation during July 2012, and since January 2013, Mother exercised shared legal custody and primary physical custody in Philadelphia pursuant to a custody consent order. Father shared legal custody and exercised periods of partial physical custody at his home in Camden, New Jersey.

On March 22, 2017, Father filed separate petitions for contempt and to modify the existing custody order. The trial court summarized the ensuing procedural history as follows:

Father's March 22, 2017 Petition for Modification of Custody was initially heard by a custody master who submitted a proposed order on May 8, 2017, to which Father filed [e]xceptions, alleging that the child was sexually abused by a maternal uncle, that Mother was aware of same[,] and that the Philadelphia Department of Human Services [("DHS")] was involved and recommended the child remain with Father. Mother filed for [e]xpedited [r]elief on July 17, 2017, to have the child returned to her custody.

Mother's Petition for Expedited Relief was heard on August 30, 2017, when an interim order was entered awarding primary physical custody to Father and providing that Mother was to have supervised partial physical custody on alternating Sundays at Family Court.

. . . .

Father's Petition for Contempt was denied and an interim order was entered to continue supervised partial physical custody for Mother with the child on alternating Sundays. Records concerning the allegations of sexual abuse were ordered to be produced from [DHS], as well as from the Philadelphia Children's Alliance ("PCA"), together with a copy of the DVD recording of the interview of the child at the agency.

Trial Court Opinion, 10/9/19, at 2-3 (footnotes omitted).

Following several evidentiary hearings, the trial court entered the above-referenced order awarding Mother primary physical custody of the child during the school year and shared physical custody during the summer. In rendering its decision on the record, the trial court delineated its consideration of the pertinent statutory custody factors enumerated in 23 Pa.C.S.

§ 5328(a).[1]  *See* N.T., 8/22/19, at 83-100; *M.J.M., supra*, at 335 ("[W]hen

making a custody award, '[t]he court shall delineate the reasons for its

_____

[1] Pursuant to 23 Pa.C.S. § 5328(a), the factors to be considered by the court include the following:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

decision on the record in open court or in a written opinion or order.'") (quoting 23 Pa.C.S. § 5323(d)). As it relates to the abuse allegations against Mother and the child's uncle, the court determined that both were unfounded. **_See_** N.T., 8/22/19, at 87, 126-27.

Father filed a timely appeal and a contemporaneous concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The concise statement asserted four issues concerning the court's decision to admit or exclude evidence relating to: (1) the DHS investigation, (2) A.W.'s prior therapy; (3) video evidence concerning Mother's alleged abuse; and (4)

---

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

A.W.'s preference. The remaining issue involved allegations of trial court bias that resulted in a decision that was contrary to the weight of the evidence. *See* Father's Rule 1925(b) Statement, 8/29/19, at 2-4. On October 9, 2019, the trial court entered a Rule 1925(a) opinion that addressed each of Father's assertions comprehensively.

Not all of foregoing issues listed in the Rule 1925(b) statement align with the following questions that Father enumerates in his brief:

> 1. Did [Father] or [Mother] display they are willing to allow access to [A.W.'s] school, therapy[,] and activities?
>
> 2. [Was] [Father] or [Mother] ever indicated for abusing or neglecting [A.W.]?
>
> 3. Who is more likely to keep the child safe from future abuse or neglect . . . ?
>
> 4. Who has maintained a stable environment for [A.W., and] consistently provided a safe household with no [household members who have] criminal records . . . ?
>
> 5. Who has provided more care [to] the child[,] such as therapy[,] counseling, [and] self-defense classes . . . ?
>
> 6. [With whom] . . . does [A.W.] have sibling. . . relationships [that] are affected by custody?
>
> 7. [With] [w]hich party . . . [does A.W.] prefer to live with . . . ?
>
> 8. Who has provided a more stable child care environment for [A.W.,] [Father] or [Mother]?

Father's brief at 5-6.[2]

_____

[2] Mother did not file a brief with this Court.

First, we address whether Father's issues are preserved for our review. Pursuant to Pa.R.A.P. 1925(b)(4)(vii), issues that are not included in the Rule 1925(b) statement are waived. In comparing the questions presented in Father's brief with the issues identified in his Rule 1925(b) statement, we find that Father's fifth and sixth questions, relating to extracurricular activities and sibling relationships, respectively, are waived because they were not included in the Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii). The remaining questions were either raised in, or fairly suggested by, the Rule 1925(b) statement.

We employ the following scope and standard of review in custody matters.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.
>
> With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

**M.J.M. v. M.L.G.**, 63 A.3d 331, 334 (Pa.Super. 2013).

After a thorough review of the certified record, the Father's brief and the pertinent law, we affirm the August 22, 2019 custody order on the basis of the cogent and well-reasoned opinion entered on October 9, 2019, by the distinguished Judge Doris A. Pechkurow, who explicitly incorporated the prior on-the-record delineation of the relevant best-interest factors.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/20

FILED

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
DOMESTIC RELATIONS DIVISION

B█████ B███████
Appellant

VS.

J██████ W████
Appellee

: CUSTODY NO. 0C1208305

: 2481 EDA 2019

BY:   DORIS A. PECHKUROW, S.J.

## OPINION

Appellant B██ B█████ ("Father") appeals from the August 22, 2019 order of this court, which awarded Appellee J████ W███ ("Mother") primary physical custody of the child A███ W███ born July 17, 2010. Father was awarded periods of partial physical custody during the school year and the parties are to alternate weeks of physical custody during the summer. The Notice of Appeal was timely filed on August 29, 2019, together with a Statement of Errors Complained of on Appeal in this Rule 940 Child Fast Track Appeal.

Procedural History

The specific petitions before this court were Petitions for Modification of Custody and for Contempt filed by Father on March 22, 2017. His Petition for Modification requested more time with the child, as opposed to primary physical custody. Prior to that date, an order had been entered by agreement between the parties on January 29, 2013, providing that the parties would share legal custody, Mother would have primary physical custody and Father would have periods of partial physical custody as agreed between the parties in Camden, New Jersey, where Father lived.

Mother filed for Modification on July 18, 2016, resulting in an order entered March 9, 2017, which denied Exceptions filed by Father to a proposed order from the custody master, pursuant to which Father was awarded partial physical custody on alternating weekends with a holiday schedule, while the other custody provisions of the 2013 order remained.[1]

Father's March 22, 2017 Petition for Modification of Custody was initially heard by a custody master who submitted a proposed order on May 8, 2017, to which Father filed Exceptions, alleging that the child was sexually abused by a maternal uncle, that Mother was aware of same and that the Philadelphia Department of Human Services was involved and recommended the child remain with Father.[2] Mother filed for Expedited Relief on July 17, 2017, to have the child returned to her custody.

Mother's Petition for Expedited Relief was heard on August 30, 2017, when an interim order was entered awarding primary physical custody to Father and providing that Mother was to have supervised partial physical custody on alternating Sundays at Family Court.

This court heard Father's March 22, 2017 Petition for Contempt on November 29, 2017, and took preliminary testimony concerning Father's Exceptions, which were scheduled for a hearing on December 19, 2017. Father's Petition for Contempt was denied and an interim order was entered to continue supervised partial physical custody for Mother with the child on alternating Sundays.[3] Records concerning the allegations of sexual abuse were ordered to be produced from the Department of Human Services ("DHS"), as well as from the Philadelphia

---

[1] Philadelphia County conducts custody matters pursuant to Pa.R.C.P. 1915.4-2, where an initial hearing is held before a custody master who then issues a proposed order or refers the matter for a de novo hearing before a judge. If a party files Exceptions to the proposed order, the Exceptions are scheduled for a judicial hearing.

[2] There was no testimony during the hearing before the custody master about abuse of the child.

[3] It must be noted that Father's May 18, 2017 Exceptions to the proposed custody order by the Master raised new matter as opposed to reviewing the testimony heard by the custody master. However, because Father's Exceptions contained serious allegations about abuse and the Department of Human Services was actively involved in the matter, this court elected to consider all current and relevant issues pertaining to custody of the child rather than require that Father file for modification.

2

Children's Alliance ("PCA"), together with a copy of the DVD recording of the interview of the child at the agency.

Additional testimony was taken during the hearing on December 19, 2017, when an order was entered for Mother to have periods of unsupervised partial physical custody on alternating weekends and regular telephone contact with the child. Another hearing date was set for July 12, 2018. Father filed for Reconsideration of the December 19, 2017 order, which was denied by order entered January 25, 2018, for reasons set forth in a Summary Opinion.

On or about March 13, 2018, this court received a copy of a Praecipe to Withdraw Father's Outstanding Exceptions and cancel the July 12, 2018 hearing. An order was then entered on March 23, 2018 to rescind the effect of the Praecipe and reinstate Father's Exceptions and maintain the hearing date of July 12, 2018. The matter was mid-trial and neither party was entitled to end the proceedings prior to a final disposition by the court.

Additional hearings were then held on July 12, 2018, September 26, 2018, June 5, 2019 and August 22, 2019, after which a final order was entered.

Factual Background

As set forth in the Procedural History above, the matter before this court began under fairly ordinary circumstances where one party (here, Mother) was the primary custodial and the other party (here, Father) had a schedule for partial physical custody on alternating weekends. It evolved into another matter altogether when allegations were made about sexual abuse by maternal uncle (actually, Mother's sister's paramour) in the home where Mother was living with her sister.

The allegations arose by way of a report to DHS on May 7, 2017 that the child complained to Father's wife that the paramour of maternal aunt (otherwise referred to as maternal uncle) had touched him inappropriately. The May 17, 2017 Team Interview Summary from Philadelphia

3

Children's Alliance ("PCA") introduced into the record on December 19, 2017, indicated that the child told Father he told Mother about the touching and Mother told the child not to tell anyone.

Incident during supervised partial physical custody.

The report of abuse resulted in removal of the child from Mother's custody by DHS, followed by an order entered August 30, 2017 that Mother was to have supervised partial physical custody at Family Court on alternating Sundays. Father took the child for only one supervised custody time on September 10, 2017, then filed a Petition for a Protection Order on behalf of the child on September 27, 2017. At the hearing on November 29, 2017 (the first time the matter was before this court), Father produced a letter ostensibly from therapist, Cheryl Mercer, LCSW, dated November 11, 2017, stating that she had been providing therapy for the child since August 8, 2017, that the child reported he was given alcohol, was forced to perform anal and oral sexual activity, that the activities were recorded by the "offenders" who posted them on line, and that he was beaten and locked in a dark place and was not fed. The letter was not written on letterhead, nor was any agency identified as providing services for the child, nor was this person ever called as a witness.[4] Notes of Testimony, November 29, 2017, p. 19.

Father testified Ms. Mercer told him the child said that at the first supervised partial physical custody period, that Mother touched his privates. Id. at 17. In his Petition for a Protection Order Father wrote that Mother pulled down the child's pants and touched his penis during the supervised partial physical custody. Id. at 27. It occurred to this court that such an incident could not have occurred without having been observed by either a Sheriff or court staff member, because the area where the supervised custody takes place is a large, open space, the doors to restrooms are in the open area and court personnel are present throughout the space. Moreover, court staff record unusual incidents in the custody log of the parties should anything occur.

---

[4] No allegations of this nature were ever found in the documents from DHS or from the N.J. Department of Child Protection.

4

Monique Severio, supervisor of supervised custody in the courthouse, was summoned by this court to describe the area where the supervised custody occurs. She explained that there were several surveillance cameras and that both sheriffs and court personnel are present and walk around the entire open area during the visiting periods. Id. at 41-48. Father was of the opinion that something could have happened and that court staff would not want to say so because it would get them in trouble. Id. at 67.

This court then contacted facilities supervisor Mark Poggio to ascertain whether video recordings were made by the surveillance cameras and he reported, via telephone testimony that recordings are made but he did not know if the videos dating back to September were still available. Id. at 73. The hearing concluded with the entry of an order resuming Mother's supervised partial physical custody and the matter was continued to December 19, 2017.

Hearing on December 19, 2017

On December 19, 2017, Mark Poggio testified that he viewed the entire video from security cameras for the time period in question on September 10th of the supervised custody area and he isolated the video showing the child entering and exiting the restroom, which video was then shown in the courtroom. Notes of Testimony, December 19, 2019, pp. 7-11. The video showed Mother and child sitting at a table near the restroom entrance, the child entered, and after a short time exited the restroom, then walked up to Mother and she appeared to be adjusting his pants and shirt. Mother and child then walked away from the restroom area and nothing else occurred. Id. at 11-17.

Mother testified that she lives with her brother and only goes to her sister's to watch her nephew when the uncle is not present. Id. at 27-29. She moved out from her sister's when DHS first visited to report the allegations. Id. at 35.

5

In light of the video evidence showing that the child's accusations about Mother were untrue, the Petition for a Protection Order was dismissed. Id. at 39.[5] An order was entered for Mother to have periods of partial physical custody with the child on alternating weekends (she had moved out from her sister's residence where the uncle lives) and it was recommended that a third party be present during periods of custody for Mother's benefit to prevent accusations that could be made if Mother and child were alone for periods of time. Mental Health evaluations were also ordered and the matter was continued for another hearing on July 12, 2018.

Father objected to the unsupervised periods of custody with Mother saying, "I just want what's best for him and to be protected from that. I just fear that if he's with her that the abuse will continue based on the cover up." Id. at 31. When questioned as to what he meant by "cover up," Father started to repeat something the child told him, continuing to rely upon statements of the child to pursue his claim the child had been abused, after having witnessed a video which showed that the child's extraordinary accusation about what Mother did was not true and did not happen. Father did not appear to be convinced that the disparity between what the child reportedly said and what the video showed was a matter of concern. Id. at 47-49.

Motion for Reconsideration

Father filed for reconsideration of this court's December 19, 2017 order, claiming that Mother has lied and covered up abuse, that now that the truth is out he was afraid that Mother would flee and that no one will help or believe the child or protect him from abuse. The Motion was denied and the January 25, 2018 Order and Summary Opinion in support of same is part of the record on appeal.

---

[5] Father's Petition for Protection Order filed on behalf of the child was consolidated with the custody matter.

6

Several workers from the Department of Human Services were called to testify on June 5, 2019 about investigations they had conducted. The frequent contact DHS workers had with the parties and the child, their observations and the evidence or lack thereof as testified to by the witnesses and as recorded in DHS records were helpful in establishing that Mother neither committed nor ignored any abuse against the child.

Ms. Irizzary-Zayas, a supervisor in the DHS sex abuse unit, testified that between October 2018 and March 2019, there were approximately twenty (20) reports made to the department concerning the child, some of which were specific incidents and others were supplemental to a previously reported incident, all of which were concluded as unfounded or invalid.[6] Notes of Testimony, June 5, 2019, pp. 13-24. The child was interviewed by DHS as well as by the New Jersey Department of Children Protection and Permanency (sometimes referred to as DYFS) on several occasions. Id. at 21-23.

Ms. Irizzary-Zayas further testified that Paternal Grandmother had come to the agency with Father twice to complain that they thought not enough was being done. Id. at 32-33. She noted that because two agencies were involved due to residences in two states and the fact that reports continued to come in made it difficult for the child and family to be involved in counseling, which she believed was needed. Id. at 33-34.

Mildred Kenny, an investigative worker with sixteen years of experience with the department, testified that she had investigated a total of six reports concerning the child from October, 2018 – January, 2019. Id. at 42-43. She inspected Mother's home and found it to be clean and appropriate. She interviewed the child on two occasions about what he reportedly said

---

[6] A report is unfounded if there is no substantial evidence to validate a child protective services report, and invalid if there is no substantial evidence to validate a general protective services report. Id.

about Mother, aunt or Mother's home and both times he said that what he previously said did not happen, specifically, for example, that Mother did not hit him on the side, that aunt did not choke him, and he was not afraid of Mother. Id. at 46-52. One report was that the child sustained an eye injury, which occurred when the child and his eleven-year-old cousin were playing and the cousin punched him in the eye after he took the cousin's toy. The medical report indicated that while there was swelling, but it was not due to abuse. Id. at 52. At one point Father came into the office to complain about how this worker was doing her job. Id. at 50-51.

Another DHS worker Ulaysha Matheis testified that she was working on open cases of reports concerning the child, specifically, that the child reported the weekend of April 27, 2019 that he was hit on his side by his Mother for telling the truth. Id. at 61. The worker asked New Jersey DYFS to do a courtesy visit because the child had returned to New Jersey where he lived and DHS could not interview the child within the required 24 hour period. When Ms. Matheis visited Mother's home unannounced on May 10, 2019, she found the child to be safe and in no distress. The child said that he felt safe in Mother's home, and that he had fun and did things with his Mother the weekend of April 26th. Id. at 61-63. She spoke with New Jersey DYFS supervisor who said the child's story is not credible, he gives one story, then will say it did not happen, and the school counselor said the same thing, the child will come in and report that something happened then later say it did not happen. Id. at 75-76.

On another occasion Father and Stepmother had taken the child to the doctor complaining about abuse related to the child's side. Ms. Matheis described her interview with the child after this report, that at first he insisted he was hit on his side but the worker saw no bruising. The child then described activities he does with Mother and when asked about what happens when he returns to Father's home he said that when he gets home they ask him what happened and what Mother did. When asked why he doesn't tell them if he had a good visit or went to the zoo, he said, "I

8

didn't think of that." Id. at 66-68. She also said the child had given her a definition of what abuse is and what bribing is, which she found to be unusual for a child of his age, e.g., when the child was showing the worker things in his bedroom he said his Mother bought them, and that she was bribing him. Id. at 68-69.

Ms. Matheis had been with the department for 13 years. She said that when she asked the child why he does not say when he had a good time with Mother he told her, "Because I feel like I have to say she did hit me." He did not say, however, that Father or Stepmother told him he had to say that. Id. at 89.

A fourth DHS witness, Alonzo Lyas, testified he investigated two reports and spoke with the child on two occasions. During the first interview, the child said he was inappropriately touched by Mother in the shower, but he was fully clothed and he was not answering the questions clearly. Id. at 93. On another occasion the child told him nothing bad happens to him while he is at his Mother's house. Id. at 97. The worker had a conversation with Father who seemed to be frustrated concerning the outcome of the investigation and wanted to instruct the investigator about what to ask and how to ask questions. Id. at 99. On another occasion, a medical provider contacted the investigator to say the child was brought in and Father said he complained of pain in his side and shoulder but there were no bruises or marks. Shortly afterwards, Father called and said the child has bruises and the worker told Father the medical provider said that was not the case. Id. at 102. Mr. Lyas said that when the child is alone and does not feel under pressure he says he has not been harmed at Mother's home.

On August 22, 2019, Ms. Ulaysha Mathies was called to testify a second time and said that the report that created DHS involvement was the allegation of sexual abuse, that there was an uncle who was a registered sex-offender, and Mother was indicated because of allowing that person to have access to the child. Ms. Mathies had concluded, however, that Mother was not privy to that

9

information. Notes of Testimony, August 22, 2019, p. 18. None of the numerous reports made after the first one were indicated or validated and there were no new reports since June 5, 2019. Id. at 6-7.

This court then read excerpts from the DHS records showing incidents where the child said things were fine with Mother. On April 13, 2019, for example, the child said he was not harmed, that Mother did not hurt him, it would be a lie to say he was hit and he would be happy to live with his Mother. Id. at 21-28.

The child's step-sister told the DHS worker that Father and Stepmother ask her brother questions about what happens at Mother's home. Id. at 36. The worker went to Mother's home on June 27, 2019 and found no safety hazards, said the child likes being in the home, likes being with Mother, is looking forward to going to father's, feels safe in Mother's home and around her, and said Mother does nothing to hurt him. Id. at 40-42.

Interviews of the Child

The January 5, 2018 Summary Opinion in support of the order denying Father's Petition for Reconsideration of the December 29, 2017 order describes the videotaped interview of the child at Philadelphia Children's Alliance on May 17, 2017. While the DVD had not yet been seen by the parties, the PCA Interview Report was provided to them during the December hearing. The observations of the court set forth in the Opinion demonstrated how problematic the account of the child was about the incident with uncle:

> After preliminary questions the child was asked why he was there that day. His answer was that his uncle Lenny was touching the wrong place, several times. He pointed to his lap to show where, which he said his father calls his private part. When asked how uncle did this the child lifted his leg and pointed to the bottom of his pants (long pants) and said, "He went under there," (indicating uncle's hand went into the child's pant leg). In response to further questions the child said the touch was on top of his underwear, with uncle's hand, which was still and neither party said anything to the other. Uncle and child were sitting next to each other. The child then went upstairs, uncle followed. Child went into his cousin's room where he sat on the bed with his cousin watching TV and uncle touched him again

10

the same way but the cousin did not see it because cousin was not paying attention. The child's skin was never touched.

On another occasion the child was in the basement with his Mother watching TV, both were sitting on the bed. Uncle sat next to Mother on the bed, reached behind Mother and the child and touched the child's private part in the front by reaching down into the child's pants from behind, which were short pants. Mother did not see this.

When asked if the child was touched with anything other than uncle's hand, he said no. When asked if uncle had the child touch him anyplace the child said no. The child was not touched on his buttocks.

The first person the child told was Rasheeda, Father's wife. When asked if Mother knows about the touching, he said yes, and when asked how, the child said because his father told her. The interviewer specifically asked the child if he told his Mother, the child asked, "Huh?" and the question was repeated and the child said, "Yeah." When asked what he told her he said that uncle was touching him. When asked what Mother said he said, "Nothing." He was not sure when he told Mother, but he said he told Mother before he told his father.

This court further noted in the Summary Opinion, that, at the very start of the interview the child sat facing the interviewer and answered questions. After about fifteen minutes into the interview the child began moving around in his seat, stretching, then picked up markers and started coloring. During the last segment of the interview the child remained in motion, sometimes coloring, other times moving around in his seat, etc. His demeanor did not demonstrate he was paying attention to the questions or answering them as if he were telling something that actually happened. Moreover, his description of the touching by the maternal uncle was not physically possible, i.e., reaching up from the bottom of the child's pant leg while sitting next to the child and, another time, reaching from behind around another adult and placing his hand down the child's pants from behind while in a sitting position. Thus, it could not be concluded that there was inappropriate touching by maternal uncle.

The video itself was not played during courtroom proceedings because of the problem with accurately capturing the audio for purposes of the trial transcript. However, Father has never challenged the description of the video made by this court in the January 28, 2018 opinion denying

11

his Motion for Reconsideration. By order dated August 13, 2019, both parties were provided the opportunity to view the DVD recording, as well as all documents received by the court from the Philadelphia Department of Human Services, the Philadelphia Children's Alliance and the New Jersey Department of Child Protection and Permanency. Father reviewed these documents on August 19, 2019, and was able to tab specific documents to reference at the August 22, 2019 hearing and he was able to view the DVD.

July 12, 2018

During the interview of the child on July 12, 2018, lawyers for both parties were present. The transcript erroneously shows that only the child was present. The child demonstrated in preliminary questioning that he was competent to discuss school, counting, eating habits, identification of animals and the difference between telling the truth and telling a lie.

The child's testimony then became problematic. After having given specific descriptions about where he lived when he was with Mother, who else lived there and where he slept and what he did with his cousin, his answers became vague when he described that Mother was not nice to him because she hit him, threatened to take away his phone and threatened to take him to her house which is where the uncle who hurt him lived. Notes of Testimony, July 12, 2018, Interview of the child, pp. 18-20. He could not say when or why Mother said she was going to take him to her house nor when, why or even how Mother hit him. Id. at 21-23.

When asked who used to take care of him before he went to live with his father full time (which only occurred one year before, i.e., August, 2017), he said "I had to live with her house but [sic] and every Friday my daddy comes pick me up." Id. at 23-24. He insisted he saw his Father every weekend, which was not correct, particularly because he knew the difference between every weekend and alternating weekends, which was Mother's current schedule that he described as, "every two weeks on Friday." Id.

12

June 5, 2019

As explained to the parties after the child was interviewed in the robing room on June 5, 2019, he had been sleeping and was a little groggy. N.T. 6/5/19 at 116. When asked about school he said he gets 100's on his report card. He then explained that Mother has a new apartment, he has his own television and they go out only barely. N.T. 6/5/19, Interview of the child, pp. 3-5. When asked if he had any complaints about Mother, he said she hit him and punched him, pointing to the inside of his elbow then side of his stomach, and she did this, he said, because she gets mad that he tells his Father things about her home. Id. at 6. He also said he did not think his Mother loves him. Id. He was then asked why he told the social worker that he lied when he said his Mother hit him, he said that was a lie and he said that because Mother threatens him to do that but he was not going to tell lies anymore. Id.

It was concluded by this court that the child could not be relied upon to tell the truth. N.T. 6/5/19 at 116.

August 22, 2019

During the interview of the child on August 22, 2019, after he had spent almost ten (10), weeks with Mother during the summer, he described the things they did – went to the Funplex in New Jersey – a water park, arcade and bowling alley, had two cookouts and went to summer camp. Mother fed him "stuff" he likes, he was never hungry, and he spent time with two cousins and he was able to speak to his Father every day. N.T. 8/22/10, Interview of the child, pp. 3-8. When asked about the times he said his Mother used to hit him and whether that really happened or whether he said that because he was nervous or whatever, his response was, "I said that because I was nervous."[7]

---

[7] This question was worded in general language so as not to put pressure on the child about what he had not always told the truth.

13

The child was then told that if he were going to stay with his Mother, he would be able to see his Father on weekends, holidays and for vacation, and he did not complain after having to stay with Mother. He was not asked whether he wanted to live with Mother or with Father because it was the opinion of this court that for reasons set forth on the record as well as in this opinion, it was in the best interests of the child to return to Mother even if the child would have been opposed to same.

## 23 Pa.C.S.A. §5328 Factors

The custody factors set forth in Section 5328 of the Child Custody Code were addressed on the record at the hearing on August 22, 2019, pp. 83-96 and are herein incorporated by reference.

## Discussion – Points of Error Raised on Appeal

Father's Concise Statement of Errors Complained of on Appeal consists of narrative paragraphs covering more than two pages discussing the evidence and what he believed was or was not proven, and that the court showed bias. The Superior Court recently reiterated that the Rule 1925(b) Statement "is not simply a matter of filing any statement. Rather, the statement must be concise and sufficiently specific and coherent as to allow the trial court to understand the allegation of error and offer a rebuttal. S.S. v. T.J., 212 A.3d 1026, 1031 (Pa.Super. 2019). The Statement in that case appears to have been similar to the Statement submitted by Father in this matter, in that it was described as a recitation of evidence and appellant's conclusions as to what was proved. The appellate court concluded that the appellant had waived challenges to the order of the trial court by failing to comply with the requirements of Rule 1925(b), then went on to further find that the trial court had adequately explained its findings, which were supported by the record.

14

Lest Father complain that this court does not take into account information from/about Father of which he complains on appeal, his points of error will not be dismissed for failure to comply with the requirements of Rule 1925(b). Instead, this court has attempted to identify Father's points in his various paragraphs for purposes of responding to same. His Statement is attached at Exhibit "A" to the opinion in lieu of retyping the contents herein, and handwritten paragraphing has been superimposed to identify separate points addressed as follows:

(1). The Philadelphia Department of Human Services had no jurisdictional authority to investigate Father and the Department of Children Protection and Permanency in New Jersey found nothing wrong in Father's household.

The Philadelphia Department of Human Services had sole and exclusive jurisdiction to investigate the allegation of sexual abuse of the child when the child's Stepmother, who lives in Camden, New Jersey, made a report to the Philadelphia Department of Human services on May 7, 2017. The child was living with Mother at the time in Philadelphia and the reported incident occurred in Philadelphia. Significantly, it was Philadelphia DHS, the agency about which Father has repeatedly complained, that advised that the child remain with Father.

The New Jersey Department of Children Protection and Permanency worked with DHS and conducted interviews of the child and made inspections at Father's home and at the child's school, both because the agency received reports directly and on occasion was requested to assist DHS when, for example, a report was made about what happened in Philadelphia and the child had already returned to New Jersey. It is correct that nothing was reported to be "wrong" with Father's household, i.e., physical accommodations, by either agency.

(2) New Jersey protective services did not find any issues concerning Father's home, with regard to accommodations or safety; there were multiple allegations of abuse made against Mother and Mother lied in court about her residence.

It is correct that the New Jersey Department of Child Protective Services did not find any problems with Father's accommodations.

15

With regard to allegations of abuse made against Mother, as testified by the workers from DHS, numerous complaints were made about Mother, but the only reports that were indicated were that the child had contact with a registered sex offender, who the paramour of Mother's sister, and that Mother was permitted same. The assigned DHS worker concluded, however, that Mother was not aware of his status as a registered offender; that Mother moved out of the home when advised by DHS and only went to the address afterwards when the uncle was not home to babysit for her sister's children. N.T. 6/5/19 at 6-7, N.T. 8/22/19 at 18. DHS investigators did not find any problem with Mother's residence and never concluded she was not truthful about where she lived.

Father continues to complain that Mother "lied" about where she lived, despite telephone testimony from maternal uncle on December 19, 2017, that Mother lived with him on East Price Street and she sometimes stayed at their sister's home on Chew Avenue (where "maternal uncle" lives). His testimony made it clear that Mother stayed at two residences, each of which was owned or rented by a relative, as opposed to Mother's having her own place.

(3)     The transcripts from May 1, 2017 showed that Mother had access to all medical, school, therapy records when the child was with Father but he did not have access to day camp information about the child during the summer of 2019.

During the August 22, 2019 hearing Father introduced certain pages from the transcript of the hearing before the custody master on May 1, 2017, to show that he testified that the school told him he was not on the school's emergency contact list. Mother then responded that Father picks up the child from school so that he would know about the school. N.T. 8/22/19 at 68. With regard to day camp information about the child during the summer of 2019, the interim order awarding Mother physical custody of the child during the summer of 2019 did not require that Mother provide information to Father as to where the child was enrolled for summer camp and there was no evidence that Father requested same and was then denied information. Thus, Father's

16

complaints about lack of information about the child did not show any willful intent or actions by Mother to conceal information nor fail to provide same upon request.

On the other hand, Mother's lawyer complained to the court on December 19, 2017, that Father refused to sign a release to allow Mother to talk to the child's therapist. N.T. 12/19/17 at 54, and medical records showed that Stepmother was worried the hospital would be providing information to Mother, indicating attempts on the part of Father or Stepmother to limit Mother's access to information about the child. N.T., 8/22/19 at 38.

(4)    The medical file of the child showed abuse that occurred from 2017 to the present time and the child's school counselor voiced concerns to DHS and NJ investigators about Mother's periods of custody.

Nothing in the medical records from New Jersey Virtua – which were ordered by this court as opposed to being produced by Father – had any finding of abuse, as reflected in the excerpts of same read into the record. N.T. 8/22/19 at 38-43.

With regard to school personnel, the counselor Ms. Kristi White, called the New Jersey social worker to say the child was crying and told his teacher his Mother hit him on the back. Then when Ms. White spoke to the child, he told her he made everything up about his mom and when Father came to pick up the child the child ran to Father and told him his Mother was nice and would not do this to him. Ms. White then told the worker she thought it sounded scripted. Id. at 33. The principal Charles Zimmerman told the social worker on May 2, 2019 that he had never seen any marks or bruises on the child, that while the child he has said things happened in his Mother's home, the stories changed so much you did not know what to believe. The principal had no concerns at that time. Id. at 35.

(5)    Medical records showed abuse of the child while in Mother's care, with regard to a rib cage and eye injury.

17

The child was brought to New Jersey Virtua for evaluation of his eye on October 29, 2018 with the report that the child was punched by his nine-year-old cousin when he got in a fight with him, and that when the child told his Mother, she did not do anything. N.T. 8/22/19 at 40. When the provider talked to the child alone, he said it was his cousin that punched him and he denied abuse over the weekend from Mother. Id. at 42. Mother testified that she heard a fight upstairs and went up to tell them to stop. Id. at 41-42. The child himself said he was upstairs when it happened and Mother came upstairs and told the two to stop fighting. N.T. 8/22/19, Interview of the Child at 6-7. It is incorrect that the medical record concluded this was abuse.

With regard to the child's rib cage, on May 1, 2019, an ultrasound was done of the child's stomach showing the spleen was normal in appearance and the study was unremarkable after the patient reported being hit by his Mother and complaining of stomach pain and mild difficulty breathing. Id. at 43.

(6)     The court accused Paternal Grandmother of coercing the child and brought her into the courtroom and did not allow her to defend herself.

Paternal Grandmother, C██████B█████ inserted herself into this custody matter when she twice accompanied Father to complain to DHS personnel about how the investigation was proceeding, as set forth above. Then Grandmother sent an email to the agency on May 7, 2019, that she would "love for the whole matter about A██ W██ and his biological Mother, J████ W██ to simply go away," that Mother displays "psychopathic behavior" and that responsible parties are ignoring that fact. She further stated she is keeping record of her emails for a possible lawsuit and that the child may sue when he gets older. N.T. 8/22/2019. She was also overheard saying that Mother was probably coaching the child when Mother and the child were placed in a separate waiting area. Id. at 8. On June 5, 2019, Mother's lawyer complained to the court that Grandmother was in the waiting area with the child and was sitting with eyes closed, praying aloud

18

that every lie will be exposed, crying for justice in the name of Jesus and crying out to the lord to protect this child. N.T. 6/5/19 at 118.

In light of Grandmother's having interjected herself into the custody matter, she was brought into the courtroom so she could hear directly from this court why Mother was awarded primary physical custody, i.e., that the evidence about how Mother and uncle physically abused the child was shown not to have happened and that continued questioning of the child by Father's family members could negatively impact Father's custody rights. Id.at 126-127. She was told that family members, including herself and Stepmother, were reported to have questioned the child and called in reports, which was taken into consideration in the decision concerning Father's custody. Id. Grandmother then interrupted the court to argue that her civil rights were being violated by accusations of the court. She was then excused. Id.

This court was wholly within its authority to advise Grandmother as set forth above, since evidence clearly showed that the involvement of Grandmother and Stepmother contributed to the environment where the child felt pressured and/or encouraged to continuously make false allegations about Mother, despite clear evidence such as the video of the child's supervised visit with Mother, that the child makes up stories about Mother.

(7) The accusation against Mother of touching the son during supervised partial physical custody and the video showing what happened has nothing to do with "current circumstances" and shows bias by the court in the final decision.

Father disobeyed a custody order by failing to take the child for periods of supervised physical custody at the family court building, he filed a Petition for a Protection Order on behalf on the child claiming that Mother sexually assaulted the child during a supervised visit and asking that she be prohibited from having contact with the child, and after a video was produced showing the incident never happened, he argues that this has nothing to do with "current circumstances."

19

The "current circumstances" are whether this court has abused its discretion in returning primary physical custody of the child to Mother after the child was removed from Mother's custody due to allegations of sexual abuse by maternal uncle. The videotaped interview of the child about the accusations against maternal uncle, in the opinion of this court, showed that what the child was demonstrating was physically impossible, i.e., that an adult could reach up a child's long pants and make contact with his genital area while the two were sitting next to one another, or could reach behind another adult and touch the child's genital area by reaching into the back of the child's pants. Then the videotape from the supervised family court visit showed that what the child said about Mother never happened at all.

These two objective pieces of evidence are integral to establishing whether the child tells the truth when he complains about Mother, since there is no eye-witness evidence about anything else the child has said one way or another. Thus, the videotape from the supervised visit has everything to do with current circumstances of whether the child should be returned to Mother's custody since it helped show that accusations against Mother by the child were not proven and, therefore, there was no longer any justification for keeping the child from Mother.

It is telling that Father says the videotape showed what happened as opposed to saying the videotape showed that Mother never touched the child. Presumably, if Father were to acknowledges the child did not tell the truth when he made a serious accusation about Mother, he would have to acknowledge that when the child continues to make accusations – and then recants them and/or there is not proof supporting the accusations - the accusations are not reliable, and Father wants to continue to argue that the child is telling the truth when he complains about Mother.

(8)    <u>There were no reports on Mother during the summer because he did not see his therapist, doctors or counselors and had no outlet to report abuse.</u>

The child had two weekends with Father during the summer and was in summer camp the entire time. Thus, there were other adults with whom the child had contact and to whom the child could have complained had anything inappropriate occurred while the child was with Mother. Moreover, the child was interviewed on June 27, 2019, after Mother started physical custody of the child on June 14th, and the child said things were good with Mother, he liked being there, he felt safe around her and Mother does not do anything to hurt him. N.T. 8/22/19 at 36-38.

(9) The judge did not believe the child on June 5, 2019 when he said Mother hurts him but believed him on August 22nd when he said he wanted to live with Mother, showing bias.

After interviewing the child on June 5, 2019, this court explained on the record how, in the course of that interview, the child said Mother hit him, that he lied when he told the social worker she did not hit him, that he did this because Mother threatens him and he was not going to lie like that again. This court was of the opinion that one could not have faith in what the child was saying. N.T. 6/5/19 at 116-117.

Having interviewed hundreds of children in child custody cases, this court has observed that when children are telling the truth, they describe incidents with sufficient detail that the listener can picture what is being described. They do not speak in a general narrative fashion, for example, "Mother hit me here and there," but they describe what actually happened. And they generally have a demeanor which shows they are earnest and sincere such that the listener is persuaded they are telling the truth. This child, however, sounded the same way as he did on July 12, 2018 when he said Mother hit him and could not say why or how and his demeanor did not convey sincerity. This court simply could not conclude that he was telling the truth.

On the other hand, on August 22, after having been asked about what he did during his weeks with Mother, he gave a very plausible description of the places he went, what he did, what he ate and how he talked with his Father every day. The details showed he was remembering

21

things as he described them and the narration did not have any indicia of unreliability. Hence, it was reasonable for this court to conclude that the child was being truthful about his description of the summer with Mother.

(10)   Everything said against Father was taken as proof and everything said against Mother was ignored while Father had a safe environment for the child for two years and the child had a support system while Mother abused the child and the court did not believe she was capable of abuse.

Nothing was "said" against Father other than the fact that he has refused to understand that the evidence showed that the child's accusations of sexual abuse against Maternal Uncle and Mother could not have happened as he described it and that his accusation that Mother sexually abused him did not happen.

Moreover, when Father testified the child accused Mother of assaulting him during the supervised visit, this court first declared that if a Mother were so deranged to do something like that she should be in jail, doing hard time. This court further said, however, that "in no way on God's earth could that happen" because this court is aware that the supervised custody area is an open public space, there are sheriffs, court employees and scores of parents and children in the area such that no one could do what the child described and not be seen. N.T., 11/19/17 at 70, 72. Significantly, this court then summoned a supervisor to describe how the visits occur and when Father was dissatisfied with her explanation, this court took specific action to see if a video recording existed so that the truth could be learned. And yet, notwithstanding that this court took action to see whether anything had happened, this court is accused of bias when the evidence contradicted Father's accusations.

In the recitation of factors this court stated it was not doubted that Father did take good care of the child, his schooling, medical care, etc. N.T. 8/22/19 at 87-88. It was noted that the "big thing that was lacking that caused such a significant issue" was Father's lack of willingness

22

to try to ascertain whether the child was telling the truth as opposed to his tendency to believe whatever the child said – however far-fetched it might have sounded – was true. Id. at 91. This is not a case where the court does not believe Mother is not capable of abuse; this is a case where after numerous hearing, review of voluminous documents and testimony from several witnesses, there is no evidence to show that Mother abused the child.

Conclusion

As stated in the Factual Background of this case, it began as an ordinary child custody matter consisting of disputes between the parties over the custody schedule. Father's Petition for Custody Modification filed March 22, 2017 was a request for additional custody time, not primary custody. It then morphed into significantly contested litigation, including production of numerous records and testimony of witnesses to ascertain whether the serious accusations of sexual assault by a family member and mistreatment by Mother were accurate. After evidence was produced which called into question how the initial allegation of sexual abuse could have occurred as described by the child, then how a serious accusation about what Mother did to the child did not occur at all, the case against Mother, as it were, was called into question.

Numerous reports were made to DHS and child protective services in New Jersey about Mother's treatment of the child, and, worker after worker reported that the child recanted or changed his story and did so more than one time such that every investigative worker who was involved in the case, as well as school personnel, concluded that one could not trust what the child said. On the other hand, Father and his family members, Stepmother and Paternal Grandmother, continue to insist the child must be believed when he accuses Mother of wrongdoing and they continue to criticize caseworkers for not agreeing with them. Father never once expressed a concern that he wanted to be sure his child was telling the truth as opposed to maintaining that anyone who questioned the child's veracity was either not doing his/her job or was biased.

23

The tragedy is that Father proved to be a responsible parent as far as providing for the child was concerned but his continued insistence that Mother abuses the child, and the influence of his family members in support of same, manifests itself in harm to the child and in preventing a warm, cooperative parenting arrangement where both parents can share in the experience of parenting this child and watching him mature.

There was no abuse of discretion on the part of this court in the custody decision and it is requested that the order be affirmed on appeal.

BY THE COURT:

DATE: October 9, 2019

DORIS A. PECHKUROW, S. J.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

OCT 0 9

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

24

See Comment following ... ...

1. I am requesting a PA Code Section 65.14 Children's Fast Track appeal under Pa. R.A.P.102 the Superior Court of Pennsylvania on the grounds of C.R.F. 45 3.D. abuse of descretion for the 22nd of August 2019 decicion made in the Philadelphia the Court of Common.

2. Condise Statement of Errror Complained of on appeal

(i)   a. forum non-convinous and juridictional issues DHS testimony was used against me however they have no jurisdictional authority to investigate me. The investigative aurthority DCP&P did investigate me and found nothing wrong with my house hold. Their testimony was biased and based on retaliatioin for complaints lodged against them.

(2)   A███ W███ the child has lived in NJ for over two years with his father and two siblings. In this time he has had a support system in place. A███ has received eighther honor roll or principle list for entire school year of 2018 -2019. NJ child protective services has found no issues with my home the father B███ B██████. The doctors office has reported how confortable A███ W███ with his father B███ B██████. The school has reported there are no issues with fathers home. B███ B██████ father is married and when he is at work his wife takes care of A███ and his siblings. It is in the best interest of a child to stay in a stable environment. However in Mother home J██████ W███ there have been multiple allegations of abuse. The mother while at work has admited in court she has a 14 year old watch him. And wasn't sure if she could get anyone else to. She mentioned her brother watch him. But it was mentioned in court that when living with brother and there were multiple allegation of unsanitary conditions drug use dangerous animals in the home. DHS wasn't even allowed in the home. And from what they could see home did look clutered. She evaded questions about if A███ while living there had a door to his room. Before this it was established in court mother J██████ W███ was living with a teir three sex offender. During this time A███ W███ the child reported abuse. This report was in 5/6/17. The date becomes important because it was established in court 8/22/19 that mother J██████ W███ stated in a court date 5/1/17 that she lived with her brother. The sex offender is her sister husband and she really was living with them. Then on 12/19/17 court date she stated at that time she lived with her sister. It is documented mother has lied in court at the cost of the child's A███ W███'s safety. Shows a possibility she knew sisters husband was a sex offender.

(3)   With father B███ B██████ mother had access to all medical records therapy school events and information. however it was established in court Mother J██████ W███ when she had primary custody father had no access to medical or school information. This was supplied as evidence with court transcripts from 5/1/17. Father B███ B██████ asked while mother had custody during the summer 2019 she enrolled child A███ W███ in day camp did father have access to information. The mother J██████ W███ replied no.

(4)   The doctors faxed over A███'s entire medical file to Honorable Doris A. Pechurow showing the abused that has occured from 2017-current. As well as DCP&P directed their eniter file on A███'s abuse to the Honorable Doris A. Pechurow. Also school counselor Mrs. White on DHS and NJ child protective services has voiced concerns over mother visitation. That he would cry complain of pain and be off track at school. Evidence that being with mother J██████ W███ primarly is not in the best interest of the child.

2

EXHIBIT - A

b. Not hearing therapist and DCP&P, Doctor's office & School   (showing abuse of descretion)

(5)      The Honorable Judge Doris A. Pechurow and court did not contact A███'s pervious therapist at all. She looked at the DCP&P file and responded with she still don't believe anything happened inspite of all of the evidence including the doctor's reports. The doctor's reports show's in detail what has been going on with A███ pretaining to child abuse when in mom's J█████ W███ care. For example on the doctor's report its show that he had to recieve xrays on his right side of his rib cage area because he was in pain and it hurt to breath because his mother J████ W███ punched him and told him to stop telling the truth. A███ couldn't go to school because of the pain. Every incident of abuse has been reported to DCP&P AND DHS. Another incident of abuse is when A███ came back home to the father's home B██ B████ with a black swollen eye, the mother lied and said he woke up like that. Father B███ B████ took him to the doctors and it was documented in the doctor's reports as well. The mother covered up abuse and lied under oath on August 22,2019 saying it didn't happened until the father B██ B████ handed in the pictures on record of A███'s swollen eye These forms of abuse has been put into record on August 22,2019. Again with all of this evidence Judge Doris A. Pechurow still say's nothing happened she doesn't believe anything happened. Judge Doris A. Pechurow then proceeded to give the mother J█████ W███ primary custody of the child A███ W███ Her reasons were he need to be away from his father's B██ B████ family because we corhorsed him which wasn't true. Judge Doris A. Pechurow called in the father's mother C████ W███-B████ and told her that she's the reason why his primary custody was taken away because C████ W███-B████ supposedly corhorsed him which is false. She didn't allow her to defend herself against that accusation. C████ W███-B████ doesn't live with the child's father B██ B████ at all, the accusation of her corhoring him was false. Their were no proof of that at all.



(7)      c. The lower court Judge also states the reason for her decision being an old court date 11/30/17 when father B██ B████ asked for video evidence mother J████ W███ touched son A███ W███ inappropriately during supervised visitation. The judge stated it couldn't happen and father wanted to believe it did. The truth and I B██ B████ wanted to confirm or deny the allegations. If there was video evidence there is no harm in watching it. During that court date Judge Pechurow stated she doesn't beleive a mother would do this. The court date had nothing to do this event she asked about it and interjected her opinions into the incident. The court date was regarding voilations in the court order mother established back then. That evidence was ignored also and mother was given a pass on the violation. But basing 8/22/19 on a past court date having nothing to do with the current circumstances shows a clear bias.

(8)  DHS testified in court on August 22,19 saying that their hasn't been any reports on mother J████ W███ since the child A███ W███ was forced to go with her primarly for the summer, however this only proves that while his support systems such as therapist, doctors, councilors, he has no outlet to report abuse. Those people were removed from him when mother J████ W███ was giving primary care of him. The other reason why DHS wasn't called, because it was proven in court DHS was using allegations against father to give mother primary custody. Also it was stated it would be used against father B██ B████ in court by lower court judge as well. On record in DHS file it was written to screen phone calls reguarding A███ W███ abuse and neglect reports.



(9)  d. After talking to the child A███ W███, J███ Pechkurow aknowledged the child A███ wood said that his mother J████ W███ hurts him, Judge Pechkurow personal opinion was that the child is a liar. on June 5th 2019. But on August 22nd 2019 when child said he wanted to live with mother. The judge now

3

believes the childs words. Clearly shows bias.

(10)  e. Everything said against father B████ B██████ was considered proof and everything against mother was ignored. The father has establised a safe stable environment for two years for child A████ W████ Mother has not provided a safe environment in the past or current. A████ W████ the child has a support system with father his voice is heard though counselors, therapists, and doctors. With mother past indication of abuse wasnt discovered until he was in fathers care. Lower court judge doesn't believe mother is capable of abuse like stated in 11/17 transcripts. her decisions have been based on that opionion.

Brian Bunting

_Brian Bunting_

8/29/14

4